Good morning, everyone, and welcome to the Ninth Circuit. We have two matters for argument today. And as I always say, there's no extra credit for using all your time in the Ninth Circuit. So if you make your points and we're not saying anything back to you, you can sit down. That's fine with me. All right. So first up, we'll call Gwendolyn Smith v. The Commissioner. Slepian Thank you, Your Honors. Good morning. My name is Eric Slepian. I represent Gwendolyn Smith. I'm going to attempt to reserve two and a half minutes for rebuttal. Sotomayor Sure. Sotomayor Can you move over to the microphone a bit more? I'm having trouble hearing you. Slepian I think you said you had trouble hearing me, but I had trouble hearing you. Sotomayor Yes. That's what I said. Slepian Is that any better? Sotomayor Yes, much. Slepian Okay. Great. So Ms. Smith testified before the Social Security Administration almost ten years ago. And then she had an order of remand and had to do it again. So she testified again about five years after that. Both times at both hearings, a vocational consultant testified that her testimony would be consistent with disability. The Administration chooses to disbelieve Ms. Smith. And the reasons that they're putting forth are not clear and convincing. And that's why we're asking this Court to vacate the decision. The first thing the Commissioner said was this is a checkbox form. There's not enough adequate explanation. And the case law on this is clear. In fact, the District Court previously held Sotomayor You're talking about Dr. Staggert's. You're talking about hers? Slepian The Sotomayor Which checkbox form are you talking about? Slepian I'm sorry. I'm talking about I got mixed up. I'm going to backtrack. I'd like to first talk about symptom testimony, if I may. But I can also Sotomayor What was testimony? I'm sorry. Slepian The symptom testimony, the reporting of the pain complaints. Sotomayor Okay. From your client. Slepian From my client. Sotomayor Okay. Slepian The vocational consultant testified would preclude sustained work. So Social Security said that there's not enough objective data to support her complaints. One, there is objective data. But two, she suffers from impairments that don't cause objective abnormality. She has fibromyalgia. She has small fiber neuropathy. She has lupus. And these impairments aren't expected to cause neurological damage. In a previous order of the district court, they said, look, in fibromyalgia cases, you cannot reject testimony based upon a claim of a lack of objective abnormality for lack of neurological symptoms or orthopedic symptoms. This was affirmed in the district court decision in this case. It's also well settled in cases like Beneke and Revels. So I don't believe that that's a clear and convincing reason. The commissioner went on to say that they're not going to believe Ms. Smith because she traveled. And they referenced about four or five trips over a ten-year period of time. They never discussed why she traveled. Ms. Smith went to funerals for her father, for her sister. She went to visit a dying aunt, very ill aunt. And these trips are not easy for Ms. Smith. The records show that when she tries to travel, she has significant pain. The commissioner didn't like that she traveled to Flagstaff, a two-and-a-half-hour drive, for which she likely had to stop and take breaks. And there's no reason why an individual should be unable to do limited travel at the risk of losing disability benefits if you're on benefit or never getting disability benefits. Third, the commissioner says there's a one-and-a-half-year gap in treatment. We know that that's not true. Unfortunately, there were records that weren't made part of this record. But what are we supposed to do about that? It's not in the record. You didn't catch it after the ALJ opinion. You didn't catch it after the commission. And I don't even think you caught it after the district court either, until after the district court. Right? That is all accurate, Your Honor. So it is actually not in the record. Now, there is some indication in the record that she had treatment during that period because there was some reference forward and reference back, from which one might be able to infer that she had not, in fact, stopped treatment. But as to actually getting it in the record, I don't see how you can. So let's take it that these records are not part of the record and they can't become part of the record. The truth of the matter is they denied benefits saying there was a year-and-a-half gap in treatment, and there wasn't, and the court should not turn a blind eye to something we know to be inaccurate. In terms of why the records are not here as part of this record, there are many reasons for that. It's pointed out in my affidavit. There was a mix-up with the medical facility and the photocopy place. But this isn't a question of fault because there's plenty of fault to go around. Should I have caught it? Yes, I probably should have caught it. Should my client have noticed it? Sure, my client should have noticed it. Should the judge have noticed it? Absolutely, as you indicated. There is evidence there was treatment during this period, and he never asked. He could have simply said to Ms. Smith, hey, it looks like there's a gap in treatment. Was there? And at that point, this would have gone away. The record would have been ---- There's a rule in immigration cases that if you're going to rely on something for credibility purposes, you have to raise it with the claimant. We've never had such a rule in these cases, in these Social Security cases, should we? I'm sorry. Can you repeat that? There is a rule in immigration cases that if you're going to rely on some contradiction as to credibility, you have to raise that with the testifying Petitioner in that instance. That's really what you're saying didn't happen here. I've never seen that rule in Social Security cases, but should there be one? Well, one, yes, there should be. And two, Social Security policy rulings do put on the administrative law judge an obligation to inquire. And the case law says that an ALJ has a duty to fully and fairly develop the record even when the claimant is represented. I believe that's in ORIN, but I'm not sure. That's from my recollection. But there's case law that says the judge has to develop the record. And we shouldn't just turn a blind eye to the fact that this decision's wrong. Let me ask you this. Let me turn Judge Berzon's question to the standard that we apply in Social Security cases that's in our case law. As you said at the start, you said, you know, there has to be specific, clear, and convincing reasons. And our case law goes on to say that the ALJ must identify which testimony here, you know, the ALJ rejects. And then we go further and we say the ALJ must explain which evidence in the record is inconsistent with that testimony or with that testimony and why. So could you give me a couple of examples that support that proposition? I can tell you, Your Honor, that the judge didn't do this in this record. Well, I'm asking you to give me an example. Okay. So in the example, the judge wrote that they were not going to believe Ms. Smith because she traveled. But Ms. Smith and Ms. Smith testified that she had sitting, standing, walking, and lifting limitations. Nowhere in the record does the ALJ tie it together and say, it's not possible for her to have these sitting limitations if she did A, B, C, and D. And therefore, I'm ready. Well, actually, with regard to the driving trip, he did say, I'm not sure how convincing it is, but he did say, well, she couldn't have driven that far and have to stop every 20 minutes. Well, first of all, she could have, I suppose. And it was probably 45 minutes, so she would have had to stop a couple, maybe two or three times on the trip. But that would be, in that instance, he was specific about what he was saying. Two things. One, that was brought up in regard to the treating physician opinion, not in regard to claim and testimony. But more importantly, because I don't want to skirt the issue, Your Honor, Dr. Steingard said that she would need to take breaks every 25 to 45 minutes. To 45 minutes. And the break would only have to be five to nine minutes. And I don't know how we can conclude that somebody can't drive 40 minutes, take a nine-minute break, drive 45 minutes or 30 minutes, take a nine-minute break, and last for two hours. You're running out of time. Aside from just believing her, the — he also just refused to rely on the medical evidence that favored her. If we thought that those decisions were justified, could you still prevail? In other words, the way he — if he treated the medical evidence correctly, that Dr. Steingard and the others were internally contradictory and didn't justify their opinions, then what? Do you lose? No, absolutely not. And that's because the case law on this point is quite clear as well. An individual's reaction to pain is idiosyncratic. Once the individual establishes that the pain is reasonably related to the medically determinable impairments, which it is, you cannot disregard the degree of reported pain symptoms based upon a lack of objective — But doesn't she need some medical evidence that supports her degree of disability? I mean, Dr. Steingard, his checkbox is very confusing because he says she can work for eight hours. Then he says that she can sit for four hours and walk, stand for two hours. So either that means it doesn't make sense because there's only six hours, but he says she can work eight hours. And if she can work eight hours, then how is she disabled? Or it means that she can walk — she can sit for four hours and walk for two hours and stand for two hours, but then why is she disabled? So there doesn't seem to be any affirmative medical evidence supporting her disability that would be improper for the ALJ not to fail to give way to. So if that's true, aside from whether her evidence is credited, does she need some medical evidence supporting her level of disability? Yes. And that evidence supporting the — so you have to break it down into does she have medical impairments expected to cause a degree of the limitations reported by the claimant? And everybody agrees that she does. So then the question is — So if he disregarded — if we didn't overturn his disregard of the three medical witnesses who — or documents that support her, she could still win on her own testimony? Correct. A hundred percent. And that's because, again, the — you have to find reasons to disbelieve her, and the lack of objective data alone does not meet that standard. We have a clear and convincing standard for rejecting reported symptoms, and a specific and consistent standard for disabling. And so these are independent of each other. And an individual can have disabling limitations, even if a doctor believes that it shouldn't be as bad as she says. It's idiosyncratic. All right. Thank you, counsel. I'm going to give you — I'll give you two minutes for rebuttal. Good morning, Your Honors. Can you hear me sufficiently? Thank you. My name is Shea Bond, and I represent the Commissioner of Social Security in this matter. I guess I would characterize the plaintiff's argument as really taking an alternative view of this record. And I think the discussion here today establishes that. There could be a different way to look at this record that could support a different view. And that is that the ALJ looked at the record and reached a reasonable conclusion that the evidence did not support the extent of the claimant's allegations or certain medical opinions that were unsupported by or inconsistent with this record. So for — But let's assume that his discounting of the medical evidence favoring her was correct. This is what I was asking before. If — could she still prevail on her own evidence if, as your opponent says, she was — the medical evidence at least supported that she could be having the level of disability that she testified to, and the reasons for discounting her evidence we thought were not supported by substantial evidence? Could she still prevail then, even if all of the favorable medical evidence in its detail were not given away? Well, I don't think so. I apologize if I'm not understanding the question, but if she's attesting to I have these certain symptoms, and I guess you're saying you think that the ALJ's rationale is not — No, I'm saying that the three doctors filled out forms and said how disabled — that they thought she was disabled and couldn't work and how much weight she could carry and how far she could walk and so on. If the ALJ was appropriate in not crediting that evidence, but medical evidence does support that there was, you know, something wrong with her back that could give her pain, if there are not separate reasons for discrediting her own evidence, can she still prevail? With no medical — with no credited medical evidence as to how disabled she was. So it sounds like you're saying that the ALJ has appropriately discounted the medical opinions. I'm just hypothesizing. If that were true. I understand you're hypothesizing. So we X those out. Right. So is there — the remainder of the evidence, does it support her allegations? Is that — Well, can she still prevail in her own evidence if — Well, no, because the ALJ also examined not just the medical opinions, but what was actually within the treatment records, and then also with her daily activities. Oh, I understand that. So therefore, it's those reasoning — that reasoning that has to be separately inquired into, even if we don't have a problem with his ruling about the medical evidence. Well, yes. So if you're saying about the ALJ's rationale for addressing her allegations — Yes, yes. So — but the ALJ did address the allegations, is what I'm saying, and cited appropriate reasons supported by substantial evidence. So those reasons would include the daily activities that we were talking about today, and I would think that those daily activities would transverse whether the impairment is, say, her orthopedic impairment that's, you know, has more objective correlation, or, say, the fibromyalgia impairment, because the — what she was alleging was that her capacity to sit really was her problem. That's all over the treatment records, where she would say, my tolerance for sitting is really what's bringing on this pain, and standing is better for me. The ALJ addresses that in the decision and says, yeah, she said the sitting was a problem. I've assessed an RFC for light work. That encompasses a greater capacity to stand. And the reason also that I'm finding that her allegations about sitting are unsupported is that she does take these trips, not only — Well, he really only relied on that one — I mean, he mentioned the other trips, but he really only relied on that one trip. The driving trip, as an example. So we have the ability to take a long-distance trip that would take several hours to complete. And I think we — But how does he know she didn't stop three times or two times, which she would have had to stop? Well, it would have to have been a lot more than that, if we're talking about a three-hour trip. I mean, if we're talking — if she's staying every 20 minutes, that's a significant amount of stopping and driving. She said she can only sit for 20 minutes? Yes, between, like, 20 and 30 minutes. And so, you know, that — and again, that's a reasonable — But she had a good reason to be going where she was going, and — Well, and so did the claimant in Tomassetti. The Tomassetti case, the claimant had actually taken international travel, I think was actually to visit a sick relative, and I think that was also maybe to care with a sick relative, and actually had an exacerbation of his back pain during that travel. And this court found that it still was an appropriate reason for the court to rely on the travel itself to discount the back pain. So, you know, yes, I sympathize that the claimant had several deaths in the family for which she needed to travel, but we're talking about her capacity to actually do the sitting necessary to travel to these locations. And again, there can be an alternative view to — to evaluate her capacity to travel, but the ALJ's rationale was supported by this record. And I would also point that the travel wasn't the only reason. The ALJ cited treatment, that treatment — you know, her symptoms had improved. She'd also alleged that she had headaches. The headaches improved with treatment. The ALJ had also pointed out that the Percocet that she was taking for her physical pain, she had admitted that it was producing a 30 percent improvement in her pain. And when you look to the treatment records, which the ALJ also looked to, the objective treatment records — Well, her doctors were also trying to get her off Percocet for good reasons. I'm sorry? Her doctors were trying to get her off Percocet, and she was saying that the Percocet was, you know, able to reduce her symptomology on a pretty consistent level of treatment, the Percocet being, I guess, the primary. And she's admitting that it's relieving her physical pain symptoms. So you start combining — and then when you look at the treatment records, you see that when she goes into her treatment providers, they're describing her as in no acute distress, you know, she has intact mentation, she's appropriately groomed. This is a person who was alleging that she was having 9 to 10, sometimes even higher than 10 plus pain on a pain scale. It's really inconsistent for an individual to be alleging that level of physical pain and not having any kind of objective correlation within these treatment records. And then, you know, the ALJ's — That isn't consistent with the standards. Isn't that inconsistent with the rule that she doesn't have to have medical evidence as to the level of pain? It doesn't have to be, you know, an exact correlation, but I'd say the inconsistency is that no treatment provider is observing the claimant to be experiencing this very dramatic, extreme level of pain that she's alleging. I mean, when she's saying I'm over 10 out of 10 pain, that's the most excruciating pain you can imagine. She's never, like, you know, writhing in pain during her examination. She's not, like, crying out in pain when she's doing the testing maneuvers. That's the kind of a gross inconsistency that I see with this record. And it's — all of that is consistent with the relatively benign physical and diagnostic test results that the ALJ has also cited in the decision. So, you know, again, I think this is a record where you could have differing views. A different adjudicator may have come to a different outcome, but there is substantial evidence in this record to support the ALJ's outcome. Are there any other questions? Well, one further question, what shall we do about this gap in the records? It is somewhat disconcerting to know that there actually was no gap in the records and nonetheless rely on the fact that there was. Well, we have the statute which says that when such evidence is presented at this late point in the litigation, the claimant has to have good cause. And we've explained in our — a little more extensively in our motion to remand that the good cause element has not been met here. As was discussed during the opening argument, the reason — the reason the gap in treatment was very evident in the ALJ's decision once it was issued. And the fact that the claim now is that we had no idea that was what the ALJ cited as a consideration for this claim. We didn't know about it until after the district court decision just — it kind of defies reality. I understand that they put out the request for the treatment records from the facilities, but to say that we didn't really even know that there was the gap until such — you know, until the circuit court litigation just really does not make sense. So the court should not consider that additional evidence because the good cause element hasn't been achieved. But alternatively, I just don't see anything within those records either that is inconsistent with what — the content of those records is inconsistent with what is stated in the ALJ's decision. No, of course it is. You said that she didn't have — Well, I — the fact of the missing records, I agree. But when you look to the content — The fact that she didn't have — from which she inferred that she didn't have any treatment in that period, not just that there weren't records of treatment, but she didn't have any treatment. Correct. But I would submit, Your Honor, if you read the ALJ — if I can make this the last point — if you read the ALJ's decision and see how the ALJ addressed the Arizona Clinic treatment records and the commentary and the conclusions that the ALJ draws from that evidence, if you were just to look at the evidence that plaintiff attached to her motion to this court, you can see that rationale and how the ALJ analyzed it is the same. Because the same findings, it's very consistent in those 18 months' worth of records. There's the evidence of improvement. There's the evidence that she said that it was the sitting that was causing most of the problems. She was getting treatment without significant side effects, and that she was encouraged to actually be more active. All of those reasons are found in the ALJ's decision, and they would apply equally to those records from that 18-month period. So it would be our position that even if the court were to reach the issue, which it should not, or should not consider those records, it would not have harmfully impacted the outcome of the ALJ's decision. All right. Thank you, counsel. Thank you. I appreciate it. So, Judge Berzon, you asked a very specific question about Dr. Steingart's opinion and, you know, if it provided for an eight-hour day, Ms. Smith should be able to work. That's what the opinion is. I want to bring out an important factor here. As of the date last insured, Ms. Smith was 50 years of age. So if she was able to sit for six hours, stand or walk for two to three hours, under the regulations she's still disabled. It's not a question of can she do a full eight-hour workday, but it's a question of how effectively and efficiently she can do work, and we have to look at the vocational consultant testimony. The grids are very clear. This judge found that Ms. Smith's impairments preclude her from performing past work. The burden shifts. If she could do a full range of sedentary work, under the grid rule, she's disabled. And so we have to look at vocational expert testimony, not just whether a doctor says she can work or she can't work, because he may believe she could do a sit-down job, but that doesn't mean she's not disabled under the regulations. The other point that I'd like to bring up. But he did say she could stand or walk for two hours. Correct. Which is consistent with sedentary work, not light work. And under the grid rules, with that opinion, if she could sit six hours, stand or walk two hours, she wins. And I just want to make that point clear when we look at the opinion of treating physicians. Because whether she can work or not is a vocational determination, and we have two vocational consultants that testified, and we also have the grid rules that dictate certain findings in certain situations. I see them out. Can I just address that gap, the record, just two sentences? Go for it. Two sentences. Thank you. So this court has authority to remand under sentence six, as opposed to sentence four, based upon an insufficient record. And so, yes, you may not look at the contents of that record, but the fact that they exist would justify relief under sentence six, as opposed to sentence four. All right. Thank you. A lot of commas and semicolons, but it was two sentences. Appreciate that. Thank you for your argument and briefing. This matter is submitted.
judges: PAEZ, BERZON, OWENS